STOULIG, Judge Pro Tempore.
This is an appeal by defendant, First Standard Life Insurance Company, from a judgment awarding plaintiff, Dwight Per-rilloux, $5,000.00 for the loss of his leg under a group policy issued to his employer.
The undisputed and stipulated facts are that the defendant issued an “Accidental Death, Dismemberment and Loss of Sight” group insurance policy to Pellerin Milnor Corporation and that plaintiff was an employee included under the policy. On November 5, 1977, plaintiff injured his left leg in a motorcycle accident. Subsequently, some 166 days after the accident, plaintiff’s left leg was amputated. Claim was made under the policy for loss of a member which was rejected and the instant suit resulted.
The adjudication of the merits of this appeal involve the interpretation of the following provisions of the contract of insurance:
“Upon receipt of notice and due proof, as required herein, that any employee, while insured for Accidental Death, Dismemberment and Loss of Sight Benefits under the policy, shall have sustained any of the losses listed in the following Table of Losses as the direct result of accidental bodily injury and independently of all other causes, as evidenced by a visible *428 contusion or wound on the exterior of the body (except in the case of drowning or internal injuries revealed by an autopsy), and the date of occurrence of such injury is not more than ninety days prior to the date such loss was sustained, the Company Agrees to Pay, subject to the terms and conditions hereof, the amount of insurance specified for such loss in the Table of Losses, in accordance with the Full Amount of Insurance applicable to such employee as specified in the Schedule of Benefits.
TABLE OF LOSSES
In the Event of Loss of:

One Foot — One Half the Full Amount of insurance.

With respect to hands or feet, “loss” means dismemberment by severance at or above the wrist or ankle joint.”
Appellant contends that since the amputation was performed 166 days after the injury, the loss of the leg by severance did not occur within the 90 day period prescribed in the contract of insurance and therefore no coverage was afforded by the policy. It relies upon the case of Matthews v. Standard Life Insurance Company, 213 So.2d 128 (La.App. 3rd Cir. 1968) in support of its position.
Appellee does not urge that these provisions of the policy are ambiguous or uncertain but maintains the 90 day limitation is unconscionable and against public policy because it works an unreasonable mental, as well as a physical, hardship in that it requires him to make a decision concerning an irreversible medical procedure involving a physical member without affording him sufficient time to receive conservative medical treatment in an effort to avoid the loss of his leg. In addition, he cites Interstate Life & Accident Co. v. Waters, 213 Miss. 265, 56 So.2d 493 (1952) for the proposition that when a contract is subject to several interpretations, the court must construe it in the most equitable sense, ever mindful of the intent and expectation of the parties.
The trial court in its reasons for judgment stated:
“. . . I am satisfied that the loss in this particular case is covered by the insurance policy, and arrive at that conclusion based upon the medical records as well as the testimony of the treating physician, Dr. Book. To the effect that the osteo-myelitis became apparent on November 18, 1977, was never brought under control, continued to be a constant threat of amputation, and that the loss of the member was effected within the policy period.”
Appellee’s medical history reflects that on the date of the accident he was admitted to East Jefferson General Hospital emergency room, where he was seen by Dr. Marshall K. Book, an orthopedic surgeon, the treating physician. Dr. Book observed that Perril-loux sustained a deep laceration over his knee with a fragment of the distal femur protruding 4 inches through the skin. He diagnosed the injuries as an open commi-nuted fracture of the distal left femur, dislocation of the left knee and a comminuted fracture of the left patella.
Upon his admission to the hospital, appel-lee was advised there was a possibility that amputation of his leg may be necessary. Understandably, he wanted every effort made to save this extremity. After surgery on November 18, 1977 he was discharged from the hospital on December 3, 1977 and placed on oral antibiotics. He was readmitted to the hospital on December 19, 1977 because of infection and underwent surgery on December 20,1977. It was on the latter date that osteomyelitis — an infection of the bone — was first indicated. The infection was attributed to organisms present at the time of the injury. Osteomyelitis of the distal femur eventually necessitated the amputation of the member.
Dr. Book continued to conservatively treat appellee hoping to save the leg. Due to a lack of funds, plaintiff was referred to Charity Hospital on January 26, 1978. At *429 Charity conservative treatment was administered until approximately April 7, 1978 when amputation procedures were initiated and the actual surgery performed on April 21, 1978, some 166 days after the accident.
The trial court’s determination that the osteomyelitis became apparent within the 90 day period and that it necessitated the subsequent amputation of the leg is amply supported by the record. However, in construing the legal effect of the pertinent provisions of the contract of insurance we are governed by the rules laid down by the Supreme Court of this State in Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72 (1939) wherein it decreed:
“The risk assumed by the insurer is stated in the policy in clear and unambiguous language. The language of the policy so clearly speaks the intent of the parties that there is no room left for speculation as to its meaning. As relates to the two members of the body, the hand and the foot, it is a “Dismemberment Insurance” policy. It says so. On its face, it speaks of “Accidental Death and Dismemberment Insurance”, and specifies the sum to be paid for “loss of one hand by severance at or above the wrist-joint”. The indemnity specified is for the loss of a hand or a foot “by severance”. The word “severance”, according to Webster’s Dictionary, means the “Act of severing, or state of being severed; partition; separation”. According to the same authority, the word “sever” means: “1. To separate, as one from another; to cut off from something; to divide; to part in any way, esp. by violence, as by cutting, rending, etc.; as, to sever the head from the body. 2. To cut or break open or apart; to divide into parts; to cut through; to disjoin; as, to sever the arm or leg”.
Admittedly plaintiff’s right hand was not severed from the arm. The third and little fingers were severed from the metacarpus, or hand proper. But there was no severance of the hand.
The theory upon which plaintiff relies for recovery is “that it was the loss of the use of the hand, as such, that was covered by the insurance”, that “the true intent and purpose of the insurance was for indemnity against the loss of the use of the member, as such; and that, where by actual severance, either in whole or in part, the entire use of the member is wholly and totally lost, a liberal construction in line with the logical intention should be applied and recovery allowed”.

But the overwhelming weight of authority is to the effect that, where an insurance policy provides indemnity for the “loss of a hand”, or the “loss of a foot”, or the “loss of an arm”, and provides in the policy a definition or a specific statement as to what shall constitute a loss of such member, effect must be given to this qualifying definition or explanation.”
These principles of interpretation were reaffirmed by the Court in Benton Casing Service, Inc. v. Avemco Ins., 379 So.2d 225 (La.1979) and Hall v. National Life & Acc. Ins. Co., 383 So.2d 74 (La.App. 3rd Cir. 1980).
Appellee does not contend that these provisions of the contract are ambiguous or their intent uncertain. No statutory prohibition against this limitation has been cited to the court, nor do we know of any. The court’s attention has not been directed to any statute or jurisprudence which condemns such imposition of conditions limiting liability as being contrary to public policy. We can find no basis for concluding that the interpretation of these contractual provisions does not fall within the purview of the Muse case.
In the case of Matthews v. Standard Life Insurance Company, 213 So.2d 128 (La.App. 3rd Cir. 1968), which is factually apposite and contains, verbatim, the identical policy provisions, the Third Circuit construed coverage to apply only when the dismemberment by severance occurs within 90 days of the injury.
As pointed out in the Matthews case, Interstate Life & Accident Co. v. Wafers, supra, cited by appellee, can be distinguished because the medical decision to am *430 putate was made within one week of the accident but was delayed beyond the prescribed period because of the plaintiff’s weakened condition and the risk involved in attempting surgery sooner.
The Matthews case also distinguishes the Westenhover v. Life & Casualty Ins. Co., 27 So.2d 391 (La.App. 2nd Cir. 1946) on the ground that the contractual provisions are different.
While this court sympathizes with plaintiff’s plight, we are constrained to admit that the constructions placed on the coverage by Matthews is correct. Though at first blush it may appear to be harsh, this interpretation is in accord with the guidelines expressed in the Muse case.
We conclude there is no ambiguity in the contractual provisions defining loss and the time limitation within which coverage is afforded. Appellant had the contractual right to restrict its liability to a prescribed period and in so doing did not contravene any declared public policy of this state, nor was its right to do so inhibited by statute.
For the reasons assigned the judgment of the trial court is reversed and judgment is rendered in favor of defendant, First Standard Life Insurance Company, and against the plaintiff, Dwight Perrilloux, dismissing plaintiff’s demand.

REVERSED.